**HARVARD PROPERTIES, LLC.,**
**Plaintiff–Respondent,**

v.

**CITY OF SPRINGFIELD,**
**Defendant–Appellant.**

**No. 28601.**

Missouri Court of Appeals,
Southern District,
Division One.

Aug. 29, 2008.

Thomas E. Rykowski, Springfield, MO, for appellant.

Rick Muenks, Springfield, MO, for respondent.

JEFFREY W. BATES, Judge.

Harvard Properties, LLC (Harvard) owned four basement apartments which were damaged by two sewer backups that occurred after heavy rainfall in January 2005. In 2006, Harvard filed suit against the City of Springfield (City) and sought to recover damages based upon negligence and inverse condemnation theories of recovery. After a bench trial, the court found in favor of Harvard on its inverse condemnation theory and awarded it $6,870.35 in damages. On appeal, the City contends the trial court erred in finding for Harvard on that theory because the judgment is not supported by substantial evidence. This Court agrees. Consequently, the judgment is reversed. The cause is remanded with directions to enter a judgment for the City.

In this court-tried case, appellate review is governed by Rule 84.13(d).[1] The judgment must be affirmed unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law.

*Ewanchuk v. Mitchell,* 154 S.W.3d 476, 478 (Mo.App.2005). Substantial evidence is evidence which has probative force and from which the trier of fact could reasonably find the issues in harmony with its decision. *See State v. Kimes,* 234 S.W.3d 584, 586 (Mo.App.2007); *Halford v. Missouri State Highway Patrol,* 909 S.W.2d 362, 364 (Mo.App.1995).

As the court noted at the conclusion of the trial, there was little dispute about the facts giving rise to this controversy. The City installed a main trunk line for sewage underneath Patton Alley in Springfield, Missouri. The sewer line was made of vitrified clay pipe (VCP) and was eight inches in diameter. VCP has not been used by the City since 1976. During periods of heavy rainfall, VCP is more susceptible to infiltration by surface and ground water than the types of pipe currently used. Such infiltration would increase the amount of water flowing through the sewer main. The Patton Alley trunk line could be accessed through Manhole 109. The sewer main was controlled by gravity and drained south to north. The bottom of the main was 41 inches below street level. To ensure proper drainage, the lowest point in a user's building or residence should be higher than the bottom of the main.

The City maintained the sewer main, but it was the property owner's responsibility to install and maintain the lateral lines that connected to the main. In order for a lateral line to drain properly, it should have a "positive slope" of 1/4 inch of drop per foot of run from the building to the main. A positively sloping lateral line would typically connect to the sewer main at or above the 3 o'clock position on the right or the nine o'clock position on the left.

---

1. All references to rules are to Missouri Court Rules (2008).

Harvard owned Southwinds Apartments, which was an apartment complex located on South Avenue in Springfield, Missouri. This complex was built after the sewer main on Patton Alley had been installed. Building B bordered Patton Alley on the west. This building had four "garden" apartments whose floors were located 36 inches below ground level. These apartments' plumbing elbows, which were underneath a concrete slab, extended at least 8 more inches below floor level. Therefore, the lateral line running to the City's sewer main was 44 inches or more below ground level. All of the complex's sewage traveled through this four-inch lateral line. It was approximately 20 feet long and had a "negative slope" of 1/8 inch of drop per foot of run. Consequently, it was connected at the very bottom of the sewer main and sloped downward back toward the apartments. Because the apartment building had multiple stories, the head pressure from water flowing downward tended to help push sewage through the lateral. However, the negatively sloping lateral line did not drain properly and was prone to sewage backups. In addition, any water flowing through the sewer main would naturally tend to fill the lateral and flow backwards toward Building B.

At some point prior to 1994, there was a manually operated gate valve that Harvard's maintenance personnel could close whenever an incident occurred that was likely to cause a backup. This valve ceased to function because it could no longer be completely closed, so Harvard removed it from the lateral line. Harvard later dug a pit next to Building B and installed a sump pump in it. The pump was used to remove effluent from the pit and dump it onto the street. That practice ceased once the City became aware of it and told Harvard that it was not lawful to pump raw sewage onto the street.

Between 1994 and 2004, City records showed that Harvard reported four sewage backups at Building B. None of these backups were associated with heavy rainfall. In March 1998, there was a backup due to a stoppage in the main line. In January 1999, there was a backup due to heavy grease in the lateral line. The main line was clear. In April 2003, there was a backup due to a break in the lateral line. The main line was clear. In December 2004, there was another backup due to heavy grease in the line. Building B experienced more sewage backups than any other property serviced on that main sewer trunk line.

Plumber Herbert Reed also had been to Building B quite a few times to unstop blockages in the lateral line for Harvard. In February 2004, Reed was asked to reroute the lateral in an attempt to gain a proper flow. The outgoing pipe from Building B was under a concrete slab, so its elevation could not be changed. To work properly, the lateral line needed a positive drop of about five inches over the length of the line. Reed did not observe any defects in the construction of the sewer main. He rerouted the lateral, but he was unable to obtain a positive slope that would keep water running in the right direction. He installed a backflow valve in the lateral line. Due to the negative slope of the lateral, however, the backflow valve could be held open by solids that were not pushed completely through the valve due to insufficient head pressure. Reed recommended that Harvard install a lift station. This proposed fix would catch raw sewage in a sealed pit that was connected to an ejector pump located above ground. The pump would lift the sewage and force it under pressure into the sewer main. A one-way check valve on the pump would prevent any sewage from backing up. This would work even if the main were infiltrated with rainwater. The City in-

spector who reviewed Reed's work was told that the lateral repairs were temporary and would be replaced later by a lift station. Harvard opted not to install the lift station, so Reed filled in the excavation. The work permit remained open, and the City was never asked to conduct a final inspection of the February 2004 repairs.

After a heavy rain on January 5, 2005, sewage backed up into the four garden apartments of Building B. The same thing occurred again after another heavy rain on January 13, 2005. These two occurrences affected only the four garden apartments in Building B. No other buildings along Patton Alley had any sewage backups. The City's records show that, on each of those dates, there was an elevated flow in the main due to heavy rainfall. When the sewer main is infiltrated with rainwater, the rainwater and sewage backs up into the manholes and escapes onto the street. It does not back up into properties with properly sloped lateral lines. Because Building B's lowest point was below the manhole cover and its lateral line had a negative slope, however, the rainwater and sewage ran down the lateral and into the garden apartments. The backflow valve installed in the lateral line failed to operate properly and seal off that flow. Video inspections of the sewer main along Patton Alley before and after January 2005 showed no defects or cracks in the main.[2]

In February 2006, Harvard filed its petition to recover damages from the City. The claim for damages was limited to the backups that occurred on January 5 and 13, 2005. The petition contained one count alleging negligence and one count alleging inverse condemnation. Following a bench trial, the trial court entered judgment in favor of Harvard on its inverse condemna-

tion claim. The court awarded Harvard $6,870.35 in damages after finding that its property was temporarily appropriated for a public use on January 5 and 13, 2005. This appeal followed.

The City argues that the judgment is not supported by substantial evidence because Harvard failed to prove that its property was damaged by any act of the City in the design, construction or maintenance of the sewer main. This Court agrees.

■■■ The Missouri Constitution provides that "private property shall not be taken or damaged for public use without just compensation." Mo. CONST. art. I, § 26. "This concept encompasses inverse takings, where the government takes or damages land, sometimes unintentionally, without going through an official process." *Collier v. City of Oak Grove*, 246 S.W.3d 923, 925 (Mo. banc 2008). One such type of unintentional inverse taking occurs when, as a direct consequence of a condemning authority's improvement, damage is caused to land which has not been condemned or taken. *State ex rel. City of Blue Springs v. Nixon*, 250 S.W.3d 365, 371 (Mo. banc 2008); *State ex rel. State Highway Comm'n v. Swink*, 537 S.W.2d 556, 558 (Mo. banc 1976). In that circumstance, the party seeking damages for inverse condemnation is required to prove that the damage resulted from some affirmative conduct by the condemning authority. *City of Blue Springs*, 250 S.W.3d at 367.

In *Basham v. City of Cuba*, 257 S.W.3d 650 (Mo.App., 2008), this Court noted that an inverse condemnation claim arising from the operation of a city sewage system is grounded in the law of nuisance. *Id.* at

---

**2.** The main was visually inspected by City personnel using a special camera that was run through the main. According to the

City's log sheet, these inspections were conducted on 12/19/01, 3/13/06 and 3/2/07.

652. The essential elements necessary to recovery are injury, damage and causation. *Id.* "The causation element of a nuisance claim is proven when it is shown that the use of the offending property was done in a manner that caused injury to the property of the one claiming damages." *Id.*

Harvard cites *Fletcher v. City of Independence,* 708 S.W.2d 158 (Mo.App.1986), to support its argument that the proof of causation was sufficient. In *Fletcher,* the homeowners brought a nuisance claim against the City of Independence after eleven years of recurrent sewer backups into the basement of plaintiffs' home. The Fletchers presented evidence that the backups were caused by the improper design of the sewer system and by the infiltration of water, which strained the sewer line's capacity and led to water and sewage backing up the lateral line and into the Fletchers' home. *Id.* at 163–65. The design flaw was the routing of three eight-inch pipes into one eight-inch pipe near the Fletchers' home. *Id.* at 163. The infiltration problem was caused by the separation of joints in the sewer line due to long use or the force of root growth. *Id.* at 164. The infiltration was so severe that, even during very dry weather conditions, infiltrated water was flowing through the sewer at the rate of eight to ten gallons per minute. *Id.* at 165. There was no evidence that any flaw or defect in the Fletchers' lateral line played any role in the backups. The city was familiar with the sewer line's improper design and the water infiltration problems and had developed a plan to correct them, but the plan had not been implemented. *Id.* at 164. After a jury trial, the court entered a $39,000 judgment for the Fletchers. *Id.* at 175. On appeal, the western district of this Court noted that "[a] nuisance may be found from a continuous, known invasion, where after complaint and notice of damage, the landowner continues to offend and refuses to correct or discontinue the misuse." *Id.* at 167. The western district held that the judgment was supported by the evidence because:

> The evidence was abundant that the cause of the backups was simply the inadequacy of the conduits at Savage and Sea where the fluid contents of three eight-inch pipes were emptied into one eight-inch pipe. The inference was plain that the incapacity of the single eight-inch pipe to receive the effluents of the other three constituted an obstruction. The inference was plain, also, that whatever the adequacy of the system at the time of construction some thirty-five years earlier, the imperfect joints of the conduits, from long use and unsuccessful riddance of root growth and other maintenance, allowed an undue infiltration to enter and burden the sewage system— and hence induce the backups.

*Id.* at 169.

■ Harvard argues that it proved: (1) the infiltration of rainwater into the sewer main caused sewage to back up into the garden apartments; and (2) the City had notice of the infiltration problem causing multiple backups associated with Building B and failed to correct the problem. Therefore, Harvard argues that the sewer backups constituted a nuisance for which the City could be held liable, just as in *Fletcher.* This Court's review of the record, however, reveals that the evidence simply does not support Harvard's argument.

Harvard did not prove that the sewer backups were caused by infiltration of rainwater into the sewer main. While Harvard had an operational gate valve on the lateral line, there were no backups at all regardless of the weather conditions. During the 10–year period from 1994 to 2004, there was no evidence that the City

was made aware of any sewage backups onto Harvard's property that occurred after heavy rainfall. In fact, the City main was only clogged on one of the four occasions when backups were reported and investigated. All of the other stoppages involved problems with Harvard's own lateral line. In addition, Harvard's property was the only one with a lateral line that had a negative slope to it. Even during the periods of heavy rain in January 2005, only Building B had any reported sewage backups. Other properties with properly sloped lateral lines were not affected. Finally, the backups into Building B occurred after Reed recommended that Harvard install a lift station to prevent backups, and Harvard opted not to do so. Harvard also argues that VCP's susceptibility to infiltration constituted a defect in the sewer. This argument is unpersuasive due to the lack of any evidence that such infiltration caused any backups on other properties with positively sloped lateral lines. Absent such evidence, a reasonable fact finder could not conclude that infiltration, rather than a defective lateral line, was the cause of damage to Building B.

For all of the foregoing reasons, *Fletcher* is distinguishable and provides no support for Harvard's arguments. In this Court's view, the instant case is much more similar to *State ex rel. City of Blue Springs v. Nixon*, 250 S.W.3d 365, 371 (Mo. banc 2008); and *Basham v. City of Cuba*, 257 S.W.3d 650 (Mo.App., 2008).

In *City of Blue Springs*, the plaintiffs alleged that the city was liable under an inverse condemnation theory because it approved a development plat that failed to sufficiently provide for storm water drainage from homes located higher than the plaintiffs' property. *City of Blue Springs*, 250 S.W.3d at 367. The city sought prohibition, and our Supreme Court granted

relief because the plaintiffs were unable to show any affirmative conduct by the city that resulted in damage. *Id.* at 370–72. The Court noted that "the City did not require storm water to obey the laws of gravity and flow down hill across the Stevenses' lot, nor did it preclude the developers from taking additional steps to control the drainage." *Id.* at 372. The same is true here. Whenever there was any increase in the flow of the sewer main, the laws of gravity would naturally divert water and sewage into Harvard's lateral line because the Building B garden apartments were constructed below the level of Manhole 109, and the lateral line had a negative slope. The City took no action that prevented Harvard from installing a lift station to correct the problem.

Similarly, in *Basham*, the plaintiffs proved that sewage from the city's sewage system backed up into their house, but they failed to prove that the damage was caused by any blockage, damage to or malfunction of the main. In addition, there was no evidence of other backups or problems with the sewer system in the vicinity of plaintiffs' property. *Basham*, 257 S.W.3d at 651. This Court held that plaintiffs did not meet the burden of proof required because:

> [T]he city had no notice of any deficient condition in its sewer system. When the appropriate city departments were notified of the problem at plaintiffs' property, investigations failed to disclose any defect or shortcoming in the city's system that would have caused the problem. No other sewage backups were found in the area in which plaintiffs' property is located. Plaintiffs did not prove their loss was caused by shortcomings in the operation or design of the city's system; neither did plaintiffs show that the city had knowledge of any problem with the operation or mainte-

nance of the sewer system that it could or should have corrected. Plaintiffs did not establish the element of causation. *Id.* at 654. This Court reaches the same conclusion here. To accept Harvard's argument would require the City to become an insurer of the proper installation and operation of a lateral line that is not the City's responsibility or under its control.

The judgment in Harvard's favor on its inverse condemnation theory was not supported by substantial evidence. Therefore, the City's point is granted. The judgment of the trial court is reversed, and the case is remanded with directions to enter a judgment for the City.

PARRISH, P.J., and SCOTT, J., Concur.