RADER FAMILY LIMITED PARTNERSHIP, L.L.L.P., Appellant,

v.

CITY OF COLUMBIA, Missouri, Respondent.

No. WD 70907.

Missouri Court of Appeals, Western District.

April 13, 2010.

---

Michael R. Tripp, Columbia, MO, for Appellant.

Debbie S. Champion, St. Louis, MO, for Respondent.

Before: THOMAS H. NEWTON, C.J., JAMES M. SMART, JR., and CYNTHIA L. MARTIN, JJ.

THOMAS H. NEWTON, Chief Judge.

Rader Family Limited Partnership, L.L.L.P. (Rader) sued the City of Columbia (the City) for damages to its property caused by a sewer backup. Rader alleged that the City failed to maintain the sewer system and sought damages under a theory of inverse condemnation. The jury decided in favor of the City. We affirm.

**Factual and Procedural Background**

On March 14, 2004, the sewer backed up into the finished basement of a downtown building owned by Rader. It was determined that the cause of the backup was grease in the sewer line and that the grease originated from restaurants upstream of the blockage. As a result of the backup, Rader incurred $14,970.49 in cleaning and removal costs. It sued the City under, *inter alia*,[1] a theory of inverse

---

1. Other theories of causes of action were dis- missed prior to trial.

condemnation, contending that its building had been reduced in value because of the damage to the basement.

At trial, Radar argued that the City had notice that concentrations of restaurants were likely to cause grease blockages, that it failed to take preventative measures, and that this unreasonable operation of the sewer system caused the damage to Rader's building. It was adduced that the City's preventative maintenance of its sewer system included a goal of cleaning the lines every five years—though it actually cleaned the lines on an average of three years—and placing problem locations on a six-month cleaning schedule. In September of 2002, a routine cleaning and inspection of the sewer line leading to Rader's building had shown a "little grit and grease," but no further investigation was performed. It was also adduced that a city ordinance prohibited the introduction of large amounts of grease into the sewer system and food establishments are normally outfitted with "grease traps," which prevent grease from going into the sewer line and require periodic maintenance by the property owner.

The jury rendered a verdict 10–2 for the City, and the trial court entered judgment consistent with the verdict. Rader appeals, raising four points.

## Legal Analysis

■ Under the Missouri Constitution "private property shall not be taken or damaged for public use without just compensation." Mo. Const. art. I, § 26. "This concept encompasses inverse takings, where the government takes or damages land, sometimes unintentionally, without going through an official process." *Collier v. City of Oak Grove*, 246 S.W.3d 923, 925–26 (Mo. banc 2008). This type of "taking" may occur where an entity with the power of eminent domain causes damage to land

which has not been intentionally condemned or appropriated. *Harvard Props., LLC v. City of Springfield*, 262 S.W.3d 278, 281 (Mo.App. S.D.2008). Although a property owner formerly might have maintained an action for nuisance, "inverse condemnation is [now] the exclusive remedy when private property is damaged by a nuisance operated by an entity having the power of eminent domain." *Basham v. City of Cuba*, 257 S.W.3d 650, 653 (Mo. App. S.D.2008). In this type of inverse condemnation action, the "taking" is the entity's creation of a nuisance: an unreasonable interference with the rights of the property owner. *Id.* The cause of action requires a showing of notice and unreasonable operation in spite of that notice. *Id.* at 654.

## Evidence of the City's subsequent preventative measures

■ In its first point, Rader argues that the trial court erred in refusing to allow evidence of measures the City implemented to prevent grease-related sewage backups after Rader's building was damaged. We review a trial court's decision to admit or exclude evidence for abuse of discretion. *Stinson v. E.I. DuPont De Nemours & Co.*, 904 S.W.2d 428, 432 (Mo.App. W.D. 1995). The trial court abuses its discretion when its decision is arbitrary, unreasonable, or against the logic of the circumstances. *Id.*

### *Admissibility of subsequent remedial measures*

■ The trial court excluded evidence of changes later implemented by the City because of the rule against the admission of subsequent remedial measures. This exclusionary rule provides that:

> [w]hen after an event, measures are taken which, if taken previously, would have made the event less likely to occur,

evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event. This Rule does not require the exclusion of evidence as subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

*Id.* (quoting FED.R.EVID. 407). Two primary reasons for the rule are: (1) "if precautions taken could be used as evidence of previous improper conditions, no one, after an accident, would make improvements"; and (2) subsequent changes are irrelevant to proving the previous condition. *Id.*

 Rader argues that the evidence was admissible because its claim was for inverse condemnation, not negligence, and the exclusionary rule therefore did not apply. The rule against admission of subsequent remedial measures applies in negligence cases, but it does not apply to all tort claims. *Id.*; *see also Pollard v. Ashby*, 793 S.W.2d 394, 402 (Mo.App. E.D. 1990) (finding the exclusionary rule inapplicable in strict liability cases because the underlying rationales did not apply). As noted, this type of inverse condemnation claim arises from an underlying nuisance. Nuisance and negligence are fundamentally different "not only in legal classification, but in their essential features." *Proper v. City of Independence*, 328 S.W.2d 55, 60 (Mo.App.1959). As far as our research reveals, Missouri has not addressed whether the rule against admission of subsequent remedial measures applies in inverse condemnation cases; nor has it addressed more broadly whether the rule applies in nuisance cases.

However, we believe the public policy rationale for the exclusion applies here, perhaps even more so than in a typical negligence case. If plaintiffs were allowed to introduce evidence of subsequent remedial measures to prove a prior nuisance by an entity with the power of eminent domain, this could deter these entities from implementing preventative measures protecting the public. We also believe the evidentiary rationale has some application to inverse condemnation cases: while that the entity subsequently takes preventative measures could be probative of whether its prior operation was reasonable, such measures are not pertinent to showing the entity had prior notice of a problem. Hence, the trial court's decision to apply the rule against admission of subsequent remedial measures to this inverse condemnation suit was not arbitrary, unreasonable, or against the logic of the circumstances.

 Rader next argues that, even if the rule against admitting evidence of subsequent remedial measures applies, the evidence it sought to introduce was admissible under exceptions to the rule. As stated in the rule, subsequent remedial measures are not required to be excluded for the purposes of showing ownership or control, to rebut claims that precautions were not feasible, or to impeach. *Stinson*, 904 S.W.2d at 432; *see also Dick v. Children's Mercy Hosp.*, 140 S.W.3d 131, 142 (Mo.App. W.D.2004).

Rader contends its evidence was proper to rebut the City's claim that the preventative measures at issue were unnecessary and not feasible. In its opening statement, the City asserted that its witnesses would testify "the only way they know of to keep grease out of the sewer system is to turn the water off. And the only way that they know of to keep a backup from occurring for sure . . . is to turn the water off." It emphasized that the City had over 500 miles of sewer to maintain and that there are 544 food establishments in the City. This argument was continued throughout the trial. For example, the City's sewer

utility manager, Terry Hennkens, testified that to his knowledge, there was no other way the grease blockage could have been prevented. Mr. Hennkens also attested that it was not feasible to place areas of the sewer system with a high concentration of restaurants on a shorter cleaning schedule. The sewer maintenance superintendent, William Weitkemper, similarly testified that it would be "difficult and time-consuming" to place areas with high concentrations of restaurants on a six-month cleaning list and that "past history" did not bear out that it would be reasonable.

However, Rader was allowed to impeach Mr. Hennkens by asking about the City's subsequent increased inspection of areas with a high concentration of restaurants, and Mr. Hennkens admitted it was in fact feasible. Rader was also allowed to impeach Mr. Weitkemper's testimony with the fact that the City had, in fact, at least for some measure of time, placed areas with large numbers of restaurants on a six-month cleaning cycle. In its closing, Rader argued that the City could have inspected and could have increased cleaning frequency and did so after March 2004:

> The City admits that more frequent cleaning prevents blockages. You heard that. They admit that they could have done that, because they did it later in 2004. Same number of employees, same number of trucks, and they did it. It was something they were able to do.

■ Consequently, the facts that the City subsequently increased inspection frequency and placed areas with high concentrations of restaurants on a six-month cleaning list were before the jury. Rader argues that this was insufficient because it

was not allowed to develop the evidence in its case-in-chief. We disagree. The rule against the admission of subsequent measures allows admission of this type of evidence when "feasibility of precautionary measures" is "controverted" or for "impeachment." The trial court permitted the evidence of subsequent increased cleaning frequency for impeachment; we do not believe it erred in disallowing Rader to adduce it in its case-in-chief.

■ Rader also argues that it should have been permitted to introduce that the City subsequently began "(2) inspecting restaurant grease traps and interceptors for proper usage and maintenance, (3) educating its restaurant owners on the maintenance of grease traps and interceptors, and (4) issuing notices of violation (NOVs) to those restaurants that failed to properly use and maintain their grease traps and interceptors." [2] Although the City argues on appeal that its argument at trial was simply that not implementing these measures was not unreasonable (thus negating the unreasonableness element of Rader's cause of action), its defense at trial went beyond this claim. The City's defense included an argument that it would have been nearly impossible to fully prevent grease blockage because of the numbers of sewer lines, the numbers of restaurants, and its limited staff and budget. The City thus *generally* placed the feasibility of further preventative measures in controversy, which Rader contested throughout the trial as the thrust of its case. Yet, at the same time, the City did not controvert these *specific* measures. In fact, in response to Rader's questioning, the City admitted that it could have educated restaurant owners and that it could have done

2. In an offer of proof, Rader introduced the deposition testimony of Joshua IntVeld, the City's pre-treatment inspector. He attested that his position was created in October of

2006 and that he inspects restaurant grease traps, educates restaurants as to maintenance of the grease traps, and issues NOV letters to restaurants.

further inspection, which could have prevented blockages. Consequently, the trial court did not abuse its discretion in ruling that the subsequent implementation of these measures was not properly admitted as rebuttal evidence.

### Admissibility of the City's failure to issue NOVs and sovereign immunity

▇ Rader wanted to argue at trial that the City unreasonably failed to enforce the City ordinance that barred introducing large amounts of grease into the sewer system, as well as to present that the City began issuing NOVs subsequent to Rader's backup. The trial court allowed Rader to ask the City about the existence of the ordinance but excluded evidence about its enforcement or lack thereof. The City argues that this ruling was proper because enforcement of a law is a governmental function and cannot be a basis for liability to an individual citizen. *See Berger v. City of Univ. City*, 676 S.W.2d 39, 42 (Mo.App. E.D.1984). Rader argues that sovereign immunity applies in tort and that this is not a tort case. *See Clay County Realty Co. v. City of Gladstone*, 254 S.W.3d 859, 866 (Mo. banc 2008). Rader also argues that operation of a sewer system itself is a governmental function and, if the City's argument were valid, the whole case would have been subject to sovereign immunity and inverse condemnation would not lie as a cause of action.

Sovereign immunity was not the basis for the trial court's order. Although the City argued sovereign immunity in its motions in limine and the trial court used the word "discretionary" in characterizing the City's issuance of a violation, the concerns the trial court expressed dealt with relevancy and mini-trials of collateral issues. For example, in discussing its ruling at trial, the court noted that "we agreed . . .

that the reason for not issuing a violation pursuant to the ordinance could open up all kinds of things."

▇ Moreover, we do not believe the trial court abused its discretion in ruling this evidence inadmissible. In order to be admissible, evidence must be both logically and legally relevant. *UMB Bank, NA. v. City of Kansas City*, 238 S.W.3d 228, 232 (Mo.App. W.D.2007). Logically relevant evidence establishes or negates a fact in issue or corroborates other relevant evidence. *Id.* To be legally relevant, the probative value of the evidence must outweigh "the dangers of unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time or needless presentation of cumulative evidence." *Id.* (internal quotation marks and citation omitted). Here, the trial court rejected the evidence as straying too far from the material issues in the case because there could be many unrelated reasons for the City to have not enforced the ordinance. We do not believe this was so "clearly against the logic of the circumstances . . . and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *See McBurney v. Cameron*, 248 S.W.3d 36, 47–48 (Mo.App. W.D.2008). Accordingly, Rader's first point is denied.

### Exclusion of MDNR's citation of the City in August 2004

▇ In its second point, Rader argues that the trial court erred in refusing to allow it to introduce that the Missouri Department of Natural Resources (MDNR) cited the City for a backup caused by a Wal–Mart in August of 2004. It contends that because Mr. Weitkemper testified that MDNR's conservation department intended to "go after" restaurants after a *different* backup in 2001, it should have been allowed to introduce evi-

dence of the unrelated August 2004 citation. It argues that the 2004 citation rebuts inferences from Mr. Weitkemper's testimony that (1) MDNR's failure to cite the City in 2001 implied that it found the City's sewer operation was reasonable, and that (2) MDNR thought restaurants, rather than the City, should be held liable for grease backups.

■ "Where evidence has been excluded, the issue is not whether the evidence was admissible, but rather whether the trial court abused its discretion in excluding it." *UMB Bank*, 238 S.W.3d at 231 (internal quotation marks and citation omitted). The trial court did not abuse its discretion in disallowing evidence of the August 2004 citation after the Wal–Mart back-up. Evidence of the August 2004 citation for an unrelated backup had little probative value, if any, to the issue of the City's liability for Rader's backup in March 2004, and presented significant dangers of confusing the issues, misleading the jury, and, most significantly, wasting time and creating undue delay. Rader contends that the City "opened the door" to the evidence and that "[w]hen a party elicits irrelevant evidence to his benefit, it cannot object to a continuation of the evidence by the opposing party aimed at 'refuting adverse inferences arising from the incomplete nature of the evidence.'" (quoting *Wilson v. Shanks*, 785 S.W.2d 282, 285 (Mo. banc 1990)). However, we are not persuaded: testimony about the August 2004 citation was not a continuation of testimony about the 2001 backup. Consequently, Rader's second point is denied.

### Allowing the 2006 appraisal to rebut evidence of damages

■ In its third point, Rader contends the trial court erred in allowing the City to cross-examine an appraiser about an appraisal he performed two years after the backup. We review the trial court's decision to admit or exclude expert testimony under an abuse of discretion standard. *St. Charles County v. Olendorff*, 234 S.W.3d 492, 495 (Mo.App. E.D.2007). It is our view that the "trial court is in the best position to determine whether the offered testimony will help explain a witness's testimony, relate to the foundation of the witness's opinion, or merely confuse the jury." *McBurney*, 248 S.W.3d at 49.

Rader introduced an appraisal evaluating the building's value as it would have been in 2004. The appraiser testified that he actually performed the appraisal in 2007 but "reached back in time" to assess value in 2004 using an income analysis approach. He attested that prior to the backup, on March 14, 2004, the fair market value of Rader's building was $806,000, and, immediately after the backup, March 15, 2004, the building's value was $742,000. Over Rader's objection, on cross-examination the City stated that the same appraiser had performed an appraisal in 2006 in which he determined the building's fair market value in 2006 to be $865,000. Rader argues that the evidence of the 2006 appraisal was irrelevant and prejudicial.

■ In a takings case, the primary measure of damages is the lost fair market value of the property immediately after the taking. "[T]he property is treated as having been sold/rented at the date of taking." *Collier*, 246 S.W.3d at 926. Thus, the proper time to consider the property's value was only immediately before and immediately after the backup. *See* MAI 9.02. Consequently, the building's value in 2006 was not relevant to showing Rader's damages, which were sustained in 2004.

■ However, the 2006 appraisal was relevant to the City's attempt to discredit the appraiser's estimation of the building's

value in 2004. "Cross-examination of an expert witness extends to questions testing the witness' skill, credibility, qualifications, and the value and accuracy of his opinions." *Wilson*, 785 S.W.2d at 285. The City attempted to elicit that a normal appreciation rate was five percent and then to impeach the appraiser's estimation by showing that his appraisals determined the building's value to be $742,000 in 2004, immediately after the backup, and $865,000 in 2006, two years later. Because the 2006 appraisal was relevant for impeachment, the trial court did not abuse its discretion in allowing the City to introduce it during its cross-examination. Accordingly, Rader's third point is denied.

### Alleged instructional error

■■■■ In its fourth point, Rader argues that the trial court erred in refusing to give its proffered verdict director.[3] We review a trial court's decision not to give a proffered instruction under a *de novo* standard of review, determining whether it was supported by the evidence and the law. *Marion v. Marcus*, 199 S.W.3d 887, 893–94 (Mo.App. W.D.2006). We reverse only if the refusal caused prejudice materially affecting the merits of the action. *Id.* at 894.

Rader submitted an instruction requiring the jury to find for the plaintiff if:

First, defendant operated a sewer system in the City of Columbia, and

Second, defendant received due notice of grease blockages in the sewer system,

Third, after receiving due notice of grease blockages in the sewer system, defendant operated the sewer system in an unreasonable manner, and

Fourth, defendant's unreasonable operation of the sewer system allowed sewage to back up into plaintiff's building . . ., and

Fifth, such backup directly caused or directly contributed to cause damage to plaintiff.

The City objected to the fourth paragraph, contending that the word "allowed" did not require causation between a defendant's unreasonable operation of a sewer system and a plaintiff's injury. The court modified Rader's instruction, changing "allowed" in the fourth paragraph to "caused."

■■■■ We do not believe this instruction was erroneously given. "[A] verdict-directing instruction must hypothesize and require a finding of all the elements essential in law to establish the proposition upon which the verdict is based." *Matta v. Welcher*, 387 S.W.2d 265, 273–74 (Mo.App. 1965). An action for inverse condemnation arising from nuisance requires a showing of notice and unreasonable operation. *Basham*, 257 S.W.3d at 654. "Injury, damage, and causation are essential elements required for recovery on the basis of nuisance." *Christ v. Metro. St. Louis Sewer Dist.*, 287 S.W.3d 709, 711–12 (Mo. App. E.D.2009). The second paragraph of the instruction required the jury to find the City had notice of a deficiency, the third required a finding of unreasonable operation of the sewer system *after notice*, the fourth required the jury to find the unreasonable operation caused injury to Rader, and the fifth required the jury to find the injury resulted in Rader's damages. Consequently, the instruction required the jury to find in favor of Rader on each element of its case.

---

**3.** There is case law indicating that "the verdict director in [an inverse condemnation case] should follow MAI No. 26.05 (now 31.05)," *Barr v. KAMO Elec. Corp.*, 648 S.W.2d 616, 619 (Mo.App. W.D.1983). MAI 31.05, however, does not provide the elements for this type of inverse condemnation case.

Rader's proffered instruction would have permitted the jury to find against the City without a sufficient causal link between the City's "unreasonable" operation of the sewer system and Rader's injury because it was predicated merely on "allowing" third parties to cause backups. Rader's use of the word "allowed" implies that the City may be held liable merely for failing to stop restaurants from putting grease into the sewer system. However, Missouri courts have rejected liability where a "municipality had not undertaken any affirmative conduct to cause an injury, but had merely failed to alleviate the injury." *Christ*, 287 S.W.3d at 713 (finding city could not be held liable for inverse condemnation based upon an alleged failure to prospectively maintain or inspect the sewers). Because the trial court's modification of Rader's proffered instruction was not in error, Rader's fourth point is denied.

## Conclusion

For the foregoing reasons, the judgment of the trial court is affirmed.

SMART and MARTIN, JJ. concur.