Jim HULL and Nancy Hull et al., Appellant-Respondents,

v.

PLEASANT HILL SCHOOL DISTRICT, Respondent-Appellant.

WD 79302 and WD 79318

Missouri Court of Appeals, Western District.

OPINION FILED: June 6, 2017

Motion for Rehearing and/or Transfer to Supreme Court Denied June 29, 2017

Steven Mauer, Heather Zerger, Kansas City, for Appellant-Respondents.

Duane Martin, Jeffrey Marriott, Independence, Susan Robertson, J. Zachary Bickel, Kansas City, for Respondent-Appellant.

Before Division Two: Thomas H. Newton, P.J., James Edward Welsh, and Karen King Mitchell, JJ.

Thomas H. Newton, Presiding Judge

Pleasant Hill School District appeals a Cass County circuit court judgment following a jury trial in an inverse-condemnation case. The jury found that flooding caused by improvements to the District's property and their operation had taken the entirety of a 46-acre golf course owned by Mr. Jim and Ms. Nancy Hull and awarded them $3 million in damages. The District challenges the Hulls' standing and asserts instructional error. On cross-appeal, the Hulls challenge the circuit court's denial of their bill of costs. We affirm the judgment and dismiss the cross appeal because it is premature.

The Hulls testified that they had purchased the golf course from Mr. Hull's parents in 2005.[1] The Hulls reside on the golf course in a structure referred to as the clubhouse, part of which is used to conduct golf-course business. Beginning in 2007, when the District cleared and re-contoured a marshy, wooded area to create practice fields near the high school, storm-water and silt from the District's property started pouring onto the Hulls' adjacent nine-hole golf course rather than seeping onto it as before. The flooding overwhelmed the drainage systems that were in place on the Hulls' property to keep the

golf course dry and its lakes clean and within their beds. Though the flooding did not cover the entire acreage, when it occurred, all nine holes could not be played and the greens were at risk from saturation. After bringing the situation to the District's attention, Mr. Hull was assured by the District's facilities director that efforts would be made to correct the problem. While promising the Hulls over the years that each new District construction project would address the flooding, the District actually exacerbated the problem by adding additional impervious surfaces to the District's property and directing new drainage pipes to empty near the golf course. As the flooding continued, compromising the golf-course infrastructure, the Hulls continued to try to work with the District to solve the problem.

Finally disclaiming any responsibility, the District refused to further discuss the matter in 2013, and the Hulls filed an inverse-condemnation suit against the District in 2014. Following a four-day trial, the jury found that the District had totally and permanently taken the Hulls' property by inverse condemnation on October 16, 2013, and awarded them $3 million. The District had sought a partial-takings jury instruction (Missouri Approved Instruction 9.02), but the circuit court instead submitted the Hulls' proposed instruction based on MAI 4.01, allowing the jury to award them fair and just compensation if it found a total and permanent taking of their property. The circuit court entered its judgment on the verdict in October 2015 and further ordered the Hulls and Pleasant Hill Golf, Inc. to execute and deliver the property's title to the District.

---

[1] Whether reviewing a circuit court's denial of a motion for judgment notwithstanding the verdict or for new trial, we view the evidence in the light most favorable to the verdict or the trial court's order. *Ellison v. Fry,* 437 S.W.3d 762, 768 (Mo. banc 2014); *Precision Elec., Inc. v. Ex-Amish Specialties, Inc.,* 400 S.W.3d 802, 808 (Mo. App. W.D. 2013). Accordingly, we set forth the facts in the light most favorable to the jury's verdict.

In its motions for judgment notwithstanding the verdict or for new trial, the District challenged, among other matters, the Hulls' standing and the circuit court's damages instruction. The Hulls submitted a bill of costs to the court clerk, requesting the addition of $13,064 to the judgment under section 514.060.[2] Before the clerk could add costs to the judgment, the District filed a motion seeking court review of the bill of costs, claiming that, because the judgment failed to include costs, they could not be taxed against the District under section 514.200. The court denied the District's motions for judgment notwithstanding the verdict or for new trial from the bench and denied the Hulls' bill of costs. The District timely filed an appeal, and the Hulls timely filed a cross-appeal.

### Legal Analysis

 Whether a party has standing to bring a claim is a question of law that we review *de novo. Manzara v. State*, 343 S.W.3d 656, 659 (Mo. banc 2011). "To have standing, the party seeking relief must have 'a legally cognizable interest' and 'a threatened or real injury.'" *Id.* (quoting *E. Mo. Laborers Dist. Council v. St. Louis Cnty.*, 781 S.W.2d 43, 46 (Mo. banc 1989)). In the context of inverse condemnation, the owner of the property at the time the damage is ascertainable is the party entitled to bring the claim. *State ex rel. City of Blue Springs v. Nixon*, 250 S.W.3d 365, 370 (Mo. banc 2008). A damages claim " 'based on inverse condemnation [does] not pass to subsequent grantees of the land.' " *Id.* (quoting *Crede v. City of Oak Grove*, 979 S.W.2d 529, 534 (Mo. App. W.D. 1998)).

The District argues that the damages were ascertainable and the cause of action arose in 2007, the first time the golf course flooded. Because a deed recording the transfer of the golf-course property from the living trust of Mr. Hull's parents to the Hulls was not recorded until 2009, the District claims that the Hulls, as "subsequent grantees," cannot bring a damages claim based on an inverse-condemnation theory. According to the District, sections 442.380 and 442.400 support its argument that, for purposes of proving ownership during an inverse-condemnation proceeding, a recorded deed is conclusive.

Section 442.380 simply requires warranty deeds to be recorded; it states, "Every instrument that conveys any real estate, or whereby any real estate may be affected, in law or equity, proved or acknowledged and certified in the manner herein prescribed, shall be recorded in the office of the recorder of the county in which such real estate is situated." Section 442.400 states, "No such instrument in writing shall be valid, except between the parties thereto, and such as have actual notice thereof, until the same shall be deposited with the recorder for record." We agree with the Hulls that these statutes "have no bearing on when a cause of action for inverse condemnation accrues, nor do they have any bearing on when the actual transfer of the Property took place." *See Hiler v. Cox*, 210 Mo. 696, 109 S.W. 679, 682 (Mo. 1908) ("The record of a deed does not create title. It merely imparts notice of the title. As between the parties, the deed is good without recording"); *see also Zumwalt v. Forbis*, 349 Mo. 752, 163 S.W.2d 574, 577 (Mo. 1942) ("Recording is not essential in transferring title as between the parties themselves").

 In addition, our case law indicates that compliance with the recording statutes was not intended to prevent title from passing. Discussing the purpose of the recording statutes, our supreme court has

---

**2.** Statutory references are to RSMo (2000), unless otherwise indicated.

stated, "The practical effect of section 442.400 is to postpone the effectiveness of an unrecorded instrument against a third party who does not have actual knowledge of the instrument." *Bob DeGeorge Assocs., Inc. v. Hawthorn Bank*, 377 S.W.3d 592, 597 (Mo. banc 2012). "Accordingly, the recording statutes serve to protect persons who acquire an interest in the real property without notice of prior encumbrances and to 'establish [ ] a system of statutory priorities' for encumbrances affecting the real property." *Id.* (citation omitted). This principle can be traced back to *State ex rel. and to Use of Crites v. Short*, 351 Mo. 1013, 174 S.W.2d 821, 822 (Mo. 1943), where the supreme court indicated that a deed not properly acknowledged and recorded is not void; rather "there is no notice to subsequent purchasers and mortgagees." The court also stated, "The purpose of the section being to protect creditors and purchasers, the title vests in the grantee without an acknowledgement as completely as if the formalities of the statute had been complied with." *Id.* at 823. Nothing in our case law reflects an intent under the recording statutes to establish a property interest for purposes of determining whether a property owner has standing to bring an inverse-condemnation claim.

Possession is also said to convey notice of some ownership interest. *See, e.g., Langford v. Welton*, 48 S.W.2d 860, 863 (Mo. 1932) (as to occupancy of real property, court states, "The visible indicia of possession is notice, and notice is equivalent of knowledge of all that would be learned by reasonable inquiry."); *Shaffer v. Detie*, 191 Mo. 377, 90 S.W. 131, 136 (Mo. 1905) (setting forth what "has always been the law in Missouri," court states, "One may not be allowed to blindfold himself to the visible indices of ownership, such as abound in this case, and say that he had no notice"); and *Hayward v. Arnold*, 779 S.W.2d 342, 345 (Mo. App. W.D. 1989) (citing *Langford*, court states that "the purchaser of property takes subject to the rights of anyone in actual possession"). There is no evidence that anyone but the Hulls lived on the property and operated the golf course after 2005.[3] The District introduced no evidence that it dealt with anyone other than the Hulls beginning in 2007 when Mr. Hull alerted the District about the golf-course flooding. In addition, the District introduced into evidence a March 2005 lease between the Hulls and Pleasant Hill Golf, Inc., the corporate golf-course entity they own; it provided that Pleasant Hill Golf, Inc. was to pay rent to the living trust per the "purchase contract." It is reasonable to conclude on the basis of this document that the Hulls purchased the property from the living trust in 2005, and that rent from the golf-course operation would be used to some extent to finance the transaction. Thus, even if the District is correct and the taking occurred in 2007 when the property first flooded, all evidence other than the date the deed was recorded showed that the Hulls owned the golf-course property that year.

█ If, however, as the jury determined, the taking occurred in October 2013, the Hulls were indisputably the owners then and had standing to bring the inverse-condemnation claim. This Court has recognized that the accrual of a cause of action for inverse condemnation involves a factual determination as to when the damage was capable of ascertainment. *Shade v. Mo. Highway & Transp.*

**3.** In fact, Mr. Hull's father, who had owned and operated the golf course since 1992, passed away in June 2006.

*Comm'n*, 69 S.W.3d 503 (Mo. App. W.D. 2001). In this regard, we stated,

> A cause of action for inverse condemnation accrues once the fact of damage is capable of ascertainment.... This determination will turn on the facts of each case. *In a situation involving successive floods, the damage may not be ascertainable on the date of the first flood.* It may well be that it would only become 'apparent by the passage of time that the intermittent flooding was of a permanent nature.' Damages are capable of ascertainment ... when a plaintiff with a recognized theory of recovery sustains damages.

*Id.* at 514 (citations omitted) (emphasis added). We believe that sufficient evidence supported the jury's finding that the taking occurred in October 2013. The first flooding took place while the practice fields were under development in 2007 and grass had not yet been planted to absorb rainwater. The District assured Mr. Hull that the drainage issues would eventually be resolved. The Hulls were able to clean up their property and continue operating the golf course, but this became increasingly difficult as the magnitude of the flooding increased over time. When the District disclaimed responsibility by letter dated October 16, 2013, it became clear to the Hulls that the District would take no steps to alter the drainage from its property and

that flooding of the golf-course property had become permanent; any infrastructure repairs to the golf course would become futile from that point forward, and the Hulls would be unable to properly maintain and continue operating it.[4] *See* 9 Nichols on Eminent Domain® Ch. 34 § 34.03[1] (Matthew Bender 3d ed.) (observing that "whether the flooding occurs with such frequency, regularity, or permanence as to constitute a taking is a question of degree, and each case should be reviewed on its own peculiar facts"). The flooding's permanency was not ascertainable in 2007 when the first flooding took place. Sufficient evidence supports the jury's finding that the total and permanent taking occurred in October 2013, at which time, it was indisputable that the Hulls owned the golf-course property. Accordingly, they had a legally cognizable interest and actual injury that conferred standing to bring an inverse-condemnation claim against the District. This point is denied.

█ In the second point, the District claims that the circuit court erred in "submitting a modified damage instruction based on MAI 4.01, over the school district's objection." According to the District, MAI 9.02, which it tendered, "is mandatory in an inverse condemnation case when a portion of the land is damaged and the remainder of the property is claimed to be affected."[5] The District contends that the

---

4. Significantly, during trial, a District expert opined that the Hulls would have to spend at least $400,000 to alter their drainage to accommodate the flow of water coming onto the property.

5. Committee Comment A. to MAI 9.02 states, "This instruction shall be used where only part of the defendant's property is taken. It authorizes damages for the value of the property condemned and the resulting damage to the remaining property." The instruction that the District submitted stated,

> You must award plaintiffs such sum as you believe is the difference between the fair market value of the entire property immediately before the taking on May 31, 2013 and the fair market value of the remaining property immediately after the taking. In determining the fair market value of defendant's property, you may consider evidence of the value of the property including comparable sales, capitalization of income, replacement cost less depreciation, the highest and best use to which the property reasonably may be applied or adapted, the value of the property if freely sold on the

evidence adduced by the Hulls required the use of MAI 9.02, and the proper measure of damages under that instruction is "the difference in the fair market value of the entire property immediately before the taking and the fair market value of the remaining property after the taking." [6] The District further argues that the law does not equate a partial taking that includes consequential damages with a "total taking," and the jury was misdirected to award a sum it believed would "fairly and justly" compensate the Hulls for the property's fair market value, "without *requiring the jury to calculate any loss in fair market value—as required by MAI 9.02,*" all to the District's prejudice.

■ "Whether a jury is properly instructed is a matter of law subject to *de novo* review." *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 90 (Mo. banc 2010). "To reverse a jury verdict on the ground of instructional error, the party challenging the instruction must show that: (1) the instruction as submitted misled, misdirected, or confused the jury; and (2) prejudice resulted from the instruction." *Id.* at 90-91. The Hulls suggest that, while the District frames the point as instructional error to advocate for *de novo* review, it actually argues that the evidence supports a finding of partial taking only, which would subject its point to a sufficien-

cy review, whereby we view the evidence in the light most favorable to the verdict. *Ellison v. Fry*, 437 S.W.3d 762, 768 (Mo. banc 2014); *Precision Elec., Inc. v. Ex-Amish Specialties, Inc.*, 400 S.W.3d 802, 808 (Mo. App. W.D. 2013). Indeed, the District analyzes the point, in part, by addressing Mr. Hull's trial testimony and asserting that it proved only that a portion of the golf course was taken and the remainder was affected.

■ The circuit court submitted the MAI 4.01-based damages instruction to the jury following lengthy argument. Counsel for the Hulls reminded the court that the case had been brought from the start as a total and permanent takings case.[7] The court appeared to believe that the dispute should have involved an alternative claim for a partial taking, the creation of an easement, and payment for that easement so that water could cross the Hulls' property. After reviewing the case law, however, and guided by *Akers v. City of Oak Grove*, 246 S.W.3d 916 (Mo. banc 2008), the circuit court preceded the damages instruction with an "all-or-nothing" verdict director that gave the jury the option of finding either that the Hulls had suffered no taking or that the District had totally and permanently taken the Hulls' property.[8] The circuit court then read the follow-

---

open market; and generally accepted appraisal practices. You may give such evidence the weight and credibility you believe are appropriate under the circumstances.

The phrase "fair market value" as used in this [these] instruction[s] means the price that the property in question would bring when offered for sale by one willing but not obliged to sell it and when bought by one willing or desirous to purchase it but who is not compelled to do so.

6. The District observes that Mr. Hull testified that the property was worth $4 million immediately before and immediately after the "taking."

7. The Hulls further observe in their brief, in support of their claim that they are entitled to try their case and submit it to the jury on the theory of their choice, that the District resisted any effort to have the case tried on a partial-takings basis, including filing a motion in limine to preclude the Hulls from attempting to convert their claim to a partial taking.

8. Instruction No. 6, as read to the jury, was as follows:

Your verdict must be for Jim and Nancy Hull and Pleasant Hill Golf, Inc., if you believe:

First: The defendant operated improvements on its property; and

ing damages instruction (Instruction No. 7):

> If you find in favor of Jim and Nancy Hull and Pleasant Hill Golf, Inc., then you must award Jim and Nancy Hull and Pleasant Hill Golf, Inc., such sum as you believe will fairly and justly compensate them for the fair market value of the plaintiffs' real property and affected personal property.

 The District cites *Byrom v. Little Blue Valley Sewer District*, 16 S.W.3d 573, 577-78 (Mo. banc 2000), *Rader Family Ltd. Partnership, L.L.L.P. v. City of Columbia*, 307 S.W.3d 243 (Mo. App. W.D. 2010), and *Clark v. Missouri & Northern Arkansas Railroad Co., Inc.*, 157 S.W.3d 665, 671 (Mo. App. W.D. 2004), to support its claim that MAI 9.02 is mandatory in a partial-takings case. None is particularly on point. We do not believe that Missouri case law requires an inverse-condemnation plaintiff to prove that the entire property has been touched or occupied by the physical incursion (here, flooding) to prevail on a total and permanent takings claim. In fact, in *Lewis v. City of Potosi*, 348 S.W.2d 577, 580 (Mo. App. 1961), the court found the jury justified in determining that a permanent injury to the farmland had been effected by the city's discharge of contaminated sewage effluent into a creek that ran through a downstream riparian owner's land. According to the court, the plaintiff showed that for nine years "the water in Mine Au Breton Creek, at plaintiff's farm was contaminated to such an extent that it materially affected the use of the land and undoubtedly reduced the value thereof. Under the decisions, a case of permanent injury was made." *Id.* The plaintiff had alleged that the pollution rendered the land useless for domestic and livestock purposes, which was how the plaintiff used the property. *Id.* at 578. As creeks do not generally occupy the entirety of a livestock operation, it goes without saying that the pollution physically affected just a part of property; still, the court concluded that a permanent injury diminishing the value of the entire property was shown.[9]

Here, the District defended the litigation by asserting that no taking had occurred, the Hulls were responsible for the damage to their property, the property had always flooded, or the water was coming from somewhere else. And the District took steps before trial to prevent the introduction of any evidence of a partial taking. To support its claim that the Hulls proved a partial taking only, the District emphasizes testimony showing that the flooding occurred from time to time, on only part of the golf course, resulting in occasional closings and did not enter the clubhouse or a building where golf carts were stored.

---

> Second: The defendant received due notice of alleged flooding from its improvements; and
>
> Third: After receiving due notice of alleged flooding from its improvements, defendant operated the improvements in an unreasonable manner; and
>
> Fourth: That the defendant's unreasonable operation of its improvements did cause flooding on the plaintiffs' property; and
>
> Fifth: Such flooding directly caused damage to the plaintiffs; and
>
> Sixth: The plaintiffs have suffered a total and permanent taking of their property.

Under *Akers v. City of Oak Grove*, 246 S.W.3d 916, 920 (Mo. banc 2008), "[t]he primary measure of damages for a permanent taking is the lost fair market value of the property."

9. *See also Ark. Game & Fish Comm'n v. U.S.*, 568 U.S. 23, 133 S.Ct. 511, 515, 519, 184 L.Ed.2d 417 (2012) (ruling that recurrent U.S. Army Corps of Engineers-authorized flooding of limited duration that damaged or destroyed timber and disrupted ordinary use and enjoyment of property may be compensable under the Takings Clause of the U.S. Constitution).

Still, the Hulls filed a total and permanent takings case and presented evidence of a total and permanent loss to the jury. The flooding may not have covered the entirety of the property, but it made the land useless for running a golf-course business by making some of the holes unplayable, cutting off access to others by covering and damaging the cart paths, and overwhelming the course's drainage systems. Sufficient evidence supports the jury's finding of a total and permanent taking, and, under *Akers*, "[t]he primary measure of damages for a permanent taking is the lost fair market value of the property." *Akers*, 246 S.W.3d at 920. The circuit court properly instructed the jury. This point is denied.

■ In their cross appeal, the Hulls argue that the circuit court erred in denying their bill of costs under section 514.060 because they prevailed on their inverse-condemnation claim. The District directs this Court's attention to the Hulls' failure to include a jurisdictional statement in their cross appeal. The District also contends that the cross appeal is premature because the clerk did not tax costs, which an aggrieved party may appeal in due course to the court "in which the action or proceeding was had" under section 514.270.

■ Rule 84.04(i) requires that cross appeals comply with Rule 84.04, and subsection (b) requires that an appeal brief contain a jurisdictional statement. We may dismiss an appeal for failure to properly invoke our jurisdiction. *Waller v. Shippey*, 251 S.W.3d 403, 406 (Mo. App. W.D. 2008). But we are not required to do so. *See, e.g.,*

*Brown v. Ameristar Casino Kansas City, Inc.*, 211 S.W.3d 145, 148 (Mo. App. W.D. 2007) (noting this Court's preference to address the merits, but declining to do so where the brief was "so flagrantly deficient that we are not able to conduct a review of [the] case without becoming an advocate . . . ."). We are, however, compelled to agree with the District that there is nothing for us to review in the Hulls' cross appeal.

In the ordinary course of events, the judgment states that costs will be awarded, a bill of costs is submitted to the court clerk, the clerk taxes statutory costs under section 514.260, and an aggrieved party then files a motion under Rule 77.05 to have the "bill of costs reviewed by the court in which the civil action was heard." *Riggs v. State Dep't of Soc. Servs.*, 473 S.W.3d 177, 184 (Mo. App. W.D. 2015). If that motion is denied, "the party can appeal such denial." *Id.* at 185. Where the circuit clerk has not taxed costs, "no party is in a position to file a Rule 77.05 motion asking the trial court to retax costs," and any court order bearing on the question "has no legal effect, and is not a final, appealable order." *Id.*[10] Because the circuit court's order denying the Hulls' bill of costs had no legal effect, we have no final, appealable order to review. Accordingly, we dismiss the Hulls' cross appeal.

**Conclusion**

Finding that the Hulls had standing to bring this inverse-condemnation action and that the circuit court properly instructed the jury on damages, we affirm. Because a circuit-court ruling on costs in the absence

---

**10.** While the court in *Riggs v. State Department of Social Services*, 473 S.W.3d 177, 184 n.13 (Mo. App. W.D. 2015), indicates that a judgment's treatment of costs "is subject to appeal just as any other matter addressed in the judgment, because the decision to award, or to not award, costs is subject to the trial

court's discretion," the procedural posture of this case, involving the District's challenge to the Hulls' bill of costs, does not involve the judgment at all. Because we have been asked to address the propriety of the circuit court's denial of the bill of costs and no costs were entered, we simply have nothing to review.

of the court clerk taxing those costs has no legal effect, we dismiss the Hulls' cross appeal as premature.

James E. Welsh, and Karen King Mitchell, JJ. concur.